IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK MEPHAM HENSLEY, | ) | No. C 06-2001 MJJ (PR) |
| Petitioner, | ) ) | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| v. | ) ) | |
| JEANNE S. WOODFORD, Warden, | ) ) ) | |
| Respondent. | ) | |

Petitioner, a California prisoner, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the petition should not be granted on the basis of petitioner's cognizable claims. Respondent filed an answer accompanied by a memorandum and points of authority contending that the petition should be denied.

**PROCEDURAL BACKGROUND**

On July 23, 2001, the San Mateo County District Attorney charged petitioner with the 1989 murder of Kathleen Noble. On May 30, 2002, a jury convicted petitioner of first degree murder. On July 25, 2002, the trial court sentenced petitioner to 25 years to life in prison.

On December 21, 2004, the California Court of Appeal modified the judgment, reducing the crime to second degree murder and affirming the judgment of conviction. On March 30, 2005, the California Supreme Court denied review.

**FACTUAL BACKGROUND**

The following facts come from the California Court of Appeal opinion:

On March 5, 1989, Noble's body, nude from the waist up, was found in the front passenger seat of her Datsun, covered by a blanket. The car was parked on a street in East Palo Alto, about six miles from the apartment Noble was then sharing with defendant[1], and there was evidence indicating that it had been there for about 10 days. The car had been locked and there was no key in the ignition. Noble's blood was found on the waist of her partially unfastened pants and on her socks, but a criminalist testified that he did not believe she had been killed at the scene because there would have been more blood in and around the car if she had. Both of Noble's shoes were "abraded" in the back heel, indicating she had been dragged. A fingerprint matching defendant's right index finger was found on the inside of the driver's side window of the car. An open bottle of tequila and some limejuice were found in a bag inside the car. No semen was found on any item in the car.

Noble's autopsy revealed lacerations and bruising on the forehead and scalp caused by at least three separate blows with a blunt object. Her skull had numerous fractures on the right side of the forehead, which would have required "a pretty substantial quantity of force" to inflict, and were not likely to have been inflicted merely by a fist or a wall. The pathologist opined that Noble died within an hour of suffering these injuries. There were no "defensive" wounds on her body, nor were there any signs of trauma in the genital area. Noble had a blood alcohol level of 0.19 (which may have been due in part to organisms generating alcohol after death).

Noble and defendant both worked at Syva Electronics in Mountain View and since early January 1989 had shared an apartment with separate bedrooms. Noble had dated her boyfriend, Richard Schaeffer, for about two years and the two saw and spoke to each other regularly. However, coworkers at Syva Electronics testified that defendant was infatuated with Noble and had said that he would make her his girlfriend. As a result of certain incidents occurring at the apartment, Noble told a coworker that she was concerned about defendant's temper, afraid of him, and planned to move out of the apartment.

On Friday, February 24, 1989, Noble and Schaeffer planned to attend a party together. After drinking some champagne and then buying some tequila and lime juice for the party, which they left in the car, they stopped at the home of Schaeffer's sister, where they had a minor quarrel. Between 9:00 and 10:00 p.m., Noble left alone and Schaeffer went to the party with his brother. The next day Schaeffer called Noble's apartment and was told by defendant she was not there. The evidence described efforts made by Schaeffer and by Noble's sister and parents to locate Noble over the following days. During this period, these family members visited the apartment and observed that Noble's room was clean but noticed that certain items of bedding later found in her car were missing. On these occasions, defendant appeared to some to be nervous and fidgety. Noble's father thought defendant's demeanor was completely different from when he had

---

[1]The state court opinion refers to petitioner as "defendant."

2

previously met him. Defendant expressed no sympathy over Noble's disappearance. He told the parents that he might have heard Noble in the shower on the night of February 24 or the following morning.

On March 9, one of the detectives received a telephone call from Schaeffer, who told him that he had just received a call from defendant telling him that he had found blood on Noble's mattress. When the apartment was later searched, two large concentrated stains of Noble's blood and a diffuse stain that appeared as if someone had tried to clean it were found on the underside at the foot end of the mattress on Noble's bed. The box spring underneath the mattress also had blood stains that the criminologist opined had been transferred from the mattress while the blood was still wet. The wall directly above the head of the bed was damaged and had four small spots of blood. Indications of blood were also found at the head of Noble's bed, the carpet near the bed, the hallway and elsewhere in the apartment. There were signs of a bloody handprint on the mattress. On the floor in Noble's bedroom the criminologist also found two dark-colored buttons which could have come from the blouse found in the car with Noble's body, with its sleeves inside out as if someone had pulled it off without unbuttoning the cuffs.

Two days before Schaeffer's call to the police, defendant had told a detective that at midnight on February 24 he had heard the door slam and someone talking; he also told the detective that after Noble came back from going out with Schaeffer, he and Noble went to a liquor store to purchase tequila, champagne, and cigarettes. The following morning he heard the shower. He got up at 1:00 p.m. and Noble was not in the apartment. In a subsequent interview on April 1, defendant told detectives he had gone with Noble to purchase beer, tequila, and champagne before she went out with Schaeffer at 6:30 p.m. on February 24. He had gone to bed at 10:30 p.m. but heard the apartment door close at midnight, and the shower running at 11:00 a.m. the next day. When he got up at 1:00 p.m., Noble's bed was made. When the detectives told defendant that Noble had probably been killed in the apartment on the night of February 24, defendant said he would feel "pretty shitty" because he was there that night, he did not hear anything after the door closed, and he did not remember talking to Noble when she came home that night.

When told that a neighbor saw Noble come home that night and slam the door, defendant said he did talk to her and that Noble was upset, drunk and crying. Defendant at first denied being attracted to Noble. When told there was a blood stain on the bed the same size as his hand he denied seeing any injuries on Noble. He then said he went to bed about 10 minutes after Noble had arrived home and, about 20 minutes after that, thought he heard Schaeffer arrive. He heard the phone ring about 3:00 a.m. About 6:00 a.m. he said he got up to go to the bathroom and saw Noble sleeping in her bed. He saw no blood on the walls or sheets but did see a dark spot on the floor near the bathroom. When a detective told defendant that a sound test showed one could hear from one bedroom to the other, he told the detective that around 1:00 a.m. he heard Noble's voice but thought she was on the telephone. He then said that he went into Noble's room and leaned over her as she lay in bed, and did not see her head bleeding. Defendant went on to say that he had heard the springs of a mattress creaking around 3:00 a.m., when he thought Noble and Schaeffer were having sex, that he saw the outline of Schaeffer's body in Noble's bedroom when he went to the

3

bathroom at 6:00 a.m. but did not see Schaeffer when he looked into the room upon leaving the bathroom, and that Schaeffer was in the apartment when he awoke at 1:00 p.m.

Defendant at first denied having sex with Noble, then said they had sex on two occasions, but not on the night in question. When told that fingerprints had been lifted from Noble's body, defendant said they did have sex that night. Kathleen had unbuttoned her blouse, he had unbuttoned her pants, and she did not remove her shoes or socks. He went on to say (contrary to an earlier statement) that he did believe that Schaeffer had killed Noble, that he recalled hearing a deep, masculine voice in the apartment that he thought was Schaeffer, that he leaned over and touched the bed when he checked on Noble at 6:00 a.m., and that he had not seen Schaeffer leave the apartment.

One coworker at Syva Electronics testified that after Noble's body had been found, defendant told him that on the night in question she had a fight with her boyfriend, came home upset, and he had comforted her and they had ended up sleeping together.

The testimony that is central to this appeal came from Dana Margulies, who met defendant in Virginia in 1993, when they began to date. In 1996 they became engaged, but Margulies broke off the engagement at the beginning of 1999. Defendant told her that he had previously been living in California with his girlfriend when she was murdered. Defendant told her the girlfriend left to buy cigarettes after they had sex one evening and never returned. The police found his bloody thumbprints on the girlfriend's closet door and considered him a suspect, but he believed the killer was her ex-boyfriend Schaeffer.

Margulies testified to an argument she had with defendant in the spring of 1998, when defendant tried to physically remove from her finger the engagement ring he had given her, pushing her against a door and to the ground, where he got on top of her, still trying to remove the ring from her finger. She also testified to an incident that occurred in 1999, when the two were no longer engaged. After the two had lunch together and defendant gave her a pair of dancing shoes, they parted following an argument. Soon afterwards, defendant came to her home and demanded that she return the shoes and everything else he had ever given her. Defendant became very angry when Margulies three times asked him to wait outside, ultimately lunging at her, tackling her to the ground with his hands around her neck and choking her to the point that she lost consciousness. She regained consciousness, but was scared and concerned for her life before defendant left with jewelry he had previously given her. About one week later, she returned from out of town to find a message from defendant on her telephone answering machine, professing his love for her and saying: "I'm sorry I tried to kill you basically."[2]

---

[2] A transcript of the answering machine message was received in evidence and, in fuller part, read: "Just calling to say I love you and I'm very sorry. And I will leave you alone like you requested. And I will just call you periodically to let you know I love you and if I have a bad day and get on the phone and say I miss you it's true because I'm sorry. I didn't mean, I'm sorry I tried to kill you basically. I didn't, I better understand all those things when guys say I don't know what happens. But, cause I don't know what happened but either way I know you can't stand me.... Have a great time at the rehearsal. I can't, I

4

> The prosecution also presented two witnesses who were friends of defendant in the period shortly before and after the Noble killing, to whom defendant had demonstrated his interest in the martial art of kendo. To one he had shown his practice swords and practice sticks, which were two and one-half to three feet long, three-quarters to one inch thick and made of flat bamboo slabs. To the other he had demonstrated his sparring techniques, mentioning that in kendo a person attacks by stepping forward and aiming to strike the center of the head or either side of the head.
>
> Defendant presented several witnesses designed to cast doubt on various aspects of the prosecution's case. One witness testified that in 1988 he had cut himself while in Noble's apartment, leaving behind a trace of blood. An expert on police interrogation testified that the technique of falsely advising a person about the state of the evidence, as the police did to the defendant, can lead to false statements, admissions and confessions.

*People v. Hensley*, No. A099616, slip op. at 2-7 (Cal. Ct. App. 2004) (hereinafter "Slip Op.") (footnotes in original, except where noted).

## DISCUSSION

**A.    Standard of Review**

A federal court may entertain a petition for a writ of habeas corpus submitted by an individual in custody pursuant to a state court judgment only if the custody violates the United States Constitution, laws or treaties. 28 U.S.C. § 2254(a) (2005); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2005) (hereinafter "AEDPA"); *Williams v. Taylor*, 529 U.S. 362, 402-403 (2000).

A state court decision qualifies as "contrary to" federal law if it either directly contravenes a Supreme Court decision on a question of law or reaches a conclusion

---

hope it's a great show. Don't worry I'm not gonna be around I'm not, I don't want to scare you or do anything like that. I just love you very much and I hope, I hope and I pray that I'll become a better person. And I just hope you're around to see it. And I'm sorry Da, you have to understand that I am so, so sorry...."

1 converse to a Supreme Court decision with materially indistinguishable facts. *Id.* at 413.
2 A state court decision involves an "unreasonable application" of federal law if it
3 "identifies the correct governing legal principle from [the Supreme] Court's decisions but
4 unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13.  In
5 determining whether a state court's decision contravenes or unreasonably applies clearly
6 established federal law, a federal court examines the decision of the highest state court to
7 address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*,
8 217 F.3d 663, 669 n.7 (9th Cir. 2000).  In this case, the highest state court to issue a
9 reasoned opinion was the California Court of Appeal.

**B.     Legal Claims**

Petitioner claims that the admission of evidence of his "other bad acts" with Margulies constitutes a violation of Due Process because the evidence was neither relevant nor probative, and it was highly prejudicial.  Petitioner asserts that improper instructions allowed the jury to draw an impermissible inference from such evidence. Without the Margulies testimony, petitioner claims, the jury could not have reasonably returned a guilty verdict.

The California Court of Appeal set forth the following background to this claim:

> Prior to the start of trial, the court held a hearing under Evidence Code section 402 to consider the prosecution's motion to admit the evidence concerning defendant's attacks on Margulies. The prosecutor sought to introduce evidence of the two attacks described above, plus testimony by Margulies of another incident in which defendant pushed her out of his car and evidence of an email message defendant sent her in December 1999, after Margulies had criticized his ballet performance, to the effect that "right now I am sorry I loosened my grip." The evidence was offered to prove motive, intent to kill, premeditation and deliberation, identity, and a common design or plan. The prosecutor argued that defendant's attacks upon Margulies, particularly in light of his admission that he had intended to kill her, tended to show that after being similarly rejected by Noble, he intended to kill her. After hearing Margulies testify, the court granted the prosecution's motion in part, permitting the testimony concerning the incident over the ring and the strangling episode, including the subsequent answering machine message from defendant, but excluding any evidence about the car incident or the email message. The evidence was to be received for the limited purpose of showing defendant's intent,

    premeditation and deliberation. During trial, Margulies testified to the incidents that the court permitted and the jury was twice instructed that this evidence could be considered only for the limited purpose of determining whether defendant intended to kill Noble.[3] In closing arguments both attorneys reminded the jury that this evidence could not be considered to establish that defendant was the perpetrator of the killing.

Slip Op. at 7-8.

    The admission of evidence is only subject to federal habeas review if the admission violates a specific constitutional guarantee or the error is of such magnitude that the result denied the petitioner the right to a fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Id*. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983). The due process inquiry in federal habeas review is whether the admission of

---

[3] Immediately prior to Margulies' testimony on the disputed subjects, the court instructed the jury: "If you find at the close of evidence that the People have proven Mark Hensley committed the homicide of Kathleen Noble, you will be required to make a determination as to whether or not he acted with the intent to kill and whether or not he premeditated and deliberated. [¶] These terms will be defined for you later in the court's instructions. You may consider evidence of Mr. Hensley's conduct with Dana Margulies only as it may bear upon those states of mind. You may not consider Mr. Hensley's conduct with Ms. Margulies for any other purpose." As part of the instructions at the close of the trial, this instruction was repeated, preceded by the following: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] It may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent or mental state which is a necessary element of the crime charged. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in this case. You are not permitted to consider such evidence for any other purpose." The jury was also told that "[t]he prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes other than that for which he is on trial."

evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). However, only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.

The California Court of Appeal held that the admission of the Margulies evidence was in error, but that the error was harmless.[4] The Court of Appeal first noted that other bad acts evidence is admissible only for specific uses and that it cannot be used to prove a defendant's propensity to commit the charged crime. (Slip Op. at 8.) The prosecution did not offer the Margulies evidence to show Petitioner's propensity to commit the charged crimes, but rather to show his state of mind during the homicide, specifically his deliberation or premeditation. (*Id.* at 9.) When analyzing the testimony about the incident when Petitioner attacked Margulies and tried to pull off her wedding ring, the Court of Appeal noted that no evidence suggested that Petitioner had the intent to kill Margulies at the time. (*Id.* at 13.) Since he lacked such intent during the ring incident, the evidence has no logical connection to his state of mind during Noble's killing. (*Id.*) Because that evidence was prejudicial and lacked any permissible probative value, its admission was an error. (*Id.*)

While it also similarly concluded that admission of testimony about the strangling incident was error, the Court of Appeal found that such evidence presented "a closer question." (*Id.* at 13.) Petitioner's behavior in that situation was more extreme, and in his subsequent phone message he apologized for having "tried to kill [her] basically." (*Id.*) At trial, the prosecutor argued that this incident tended to show that, if Noble had resisted Petitioner's romantic advances, he would have formed the intent to kill her. (*Id.*) The Court of Appeal pointed out the absence of evidence that Noble rebuffed petitioner's

---

[4] In its opinion, the Court of Appeal also rejected Petitioner's claim that admission of evidence of his practice of kendo constituted a harmful error. Petitioner does not raise this claim in his current petition.

8

advances before the killing.  (*Id.*)  It noted that even if the evidence supported such an inference, the circumstances of the Margulies attack were very different.  (*Id.*)  The Court of Appeal went on to find that the trial court's error in admitting the Margulies evidence was not prejudicial.  (*Id.* at 14.)  In reaching this conclusion, the Court pointed to the limiting instructions that the trial court gave to the jury and the lack of dispute over the state of mind of Noble's killer.  (*Id.*)  The Court also pointed to the other evidence of Petitioner's guilt, which it characterized as "overwhelming."[5]  (*Id.*)

      The Court of Appeal also found the admission of evidence did not violate due process because it did not render the trial fundamentally unfair.  (*Id*. at 16.)  Under AEDPA, when a federal court reviews a challenge to a purely legal questions under Section 2254, it first examines whether the state court decision contradicts clearly established federal law.  28 U.S.C. § 2254(d)(1).  Then it looks at whether, after identifying the correct governing Supreme Court holding, the state court unreasonably applied that principle to the facts of the prisoner's case.  *Id.*  The California Court of Appeal tested petitioner's Due Process claim by analyzing whether the trial court's errors caused fundamental unfairness.  (*Id.* at 16) (citing *Dawson v. Delaware*, 503 U.S. 159, 179 (1992) and *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)).  This rule correctly states the clearly established federal law.  *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  Because the Court of Appeal applied the correct standard, the decision was not "contrary to . . . clearly established federal law."  28 U.S.C § 2254(d)(1).

      Moreover, the Court of Appeal's rejection of petitioner's due process claim was not an "unreasonable application" of federal law under 28 U.S.C. § 2254(d)(1).  As explained by the Court of Appeal, there was ample other the admissible evidence upon

---

[5] The Court of Appeal reduced Petitioner's conviction for first degree murder to second degree murder because the jury had insufficient competent evidence upon which to find, beyond a reasonable doubt, that Petitioner had the requisite intent for first degree murder.  (Slip Op. at 25-26.)

9

which the jury could have found defendant guilty. The forensic evidence made clear that Noble was killed on the night between February 24 and 25, 1989 in the bedroom of the apartment that she shared with petitioner. He was in the apartment during the killing. Noble's bed and bedroom were cleaned and tidied after the killing before anyone arrived looking for Noble. Petitioner was the only person with the opportunity to turn the mattress, make the bed and clean up the blood. Petitioner gave a series of contradictory accounts about what he had heard and done that evening. His statements also contradicted other evidence – contrary to his statements that he saw Noble's boyfriend in the apartment and heard him having sex with Noble, and his later claim that *he* had sex with Noble that night, there was no physical evidence of intercourse. Petitioner's account to Margulies of Noble's death, years later, was inconsistent with the facts. His reference to Noble as his girlfriend supports the testimony by coworkers at Syva that Petitioner wanted that to be the case. When police searched Noble's car, where they found her body, petitioner's fingerprint was on the inside driver's side window, despite the uncontradicted evidence that petitioner never drove Noble's car.

In addition, to the ample other evidence of petitioner's guilt, the trial court gave the jury instructions limiting the inferences that the could draw from the Margulies evidence. Specifically, the jury was instructed that it could not infer from the evidence that petitioner had a propensity to commit the crimes. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997).

In light of the ample other evidence of petitioner's guilt, and the trial court's limiting instructions about the Margulies evidence, the Court of Appeal reasonably applied federal law in finding that the admission of such evidence did not render the trial

1  fundamentally unfair so as to violate due process.[6]  *See, e.g.*, *Jammal*, 926 F.2d at 920; *Houston v. Roe*, 177 F.3d 901, 910 n.6 (9th Cir. 1999) (admission of similar prior bad acts to show motive and intent, coupled with limiting instructions, was appropriate); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction); *Butcher v. Marquez*, 758 F.2d 373, 378 (9th Cir. 1985) (admission of uncharged offenses does not violate constitutional rights where jury had opportunity to weigh credibility of complaining witness and judge admonished jury to consider incident only as evidence of intent, not as evidence of bad character).

Because the state court's denial of the claim was neither contrary to, nor an unreasonable application of clearly established federal law, petitioner is not entitled to habeas relief on his claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file and terminate all pending motions.

IT IS SO ORDERED.

DATED: ___7/6/2007_____                     _____
                                                                          MARTIN J. JENKINS
                                                                          United States District Judge

---

[6] For the same reasons, the admission of such evidence did not have a substantial and injurious effect or influence on the jury's verdict, so as to result in actually prejudice within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). *See Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (requiring showing of actual prejudice under *Brecht* in order to obtain habeas relief based on evidentiary error).